## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 09 2020, 10:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan D. Bower
Bower Law Office, LLC
New Albany, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Michael J. Sanders,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

July 9, 2020

Court of Appeals Case No.
19A-CR-2994

Appeal from the Washington
Circuit Court

The Honorable Larry Medlock,
Judge

Trial Court Cause No.
88C01-1807-MR-579

**May, Judge.**

[1]     Michael J. Sanders appeals his conviction of and sentence for murder.[1]  He presents multiple issues for our review, which we restate as:

> 1.  Whether the State presented sufficient evidence to prove Sanders committed murder;
>
> 2.  Whether the trial court committed fundamental error when it admitted Sanders' redacted field interview;
>
> 3.  Whether the State committed prosecutorial misconduct rising to the level of fundamental error based on statements made during closing argument; and
>
> 4.  Whether Sanders' sentence is inappropriate based on the nature of the crime and his character.

We affirm.

## Facts and Procedural History

[2]     On July 16, 2018, Ashley Perry went to Sanders' house looking for her husband, Skylar Naugle.  Sanders and Naugle were friends, and Perry had not seen her husband since the previous day.  Naugle also was not returning her texts or calls.  When Perry arrived at Sanders' house, Sanders told Perry that he did not know where Naugle was, but that Naugle had "just left with a girl named Jennifer in a red blazer."  (Tr. Vol. II at 154.)  Sanders told Perry the

---

[1] Ind. Code § 35-42-1-1.

girl's name may have been "Jessica. He couldn't remember." (*Id*.) Perry testified that Sanders was "fidgety" during their conversation and at one point became "aggravated" and asked Perry, "Damn, what are you the 5-0?"[2] (*Id*.)

[3] Naugle's family reported him missing on July 21, 2018. The Washington County Sheriff's Department called Detective Matt Busick of the Indiana State Police to assist with Naugle's missing person investigation. Based on their preliminary investigation, they determined Sanders was the last person Naugle was in contact with before Naugle's disappearance. Detective Busick and Detective David Mitchell, also of the Indiana State Police, went to interview Sanders at his residence about Naugle's disappearance.

[4] When the detectives arrived at Sanders' house on July 23, 2018, they knocked on the door and Sanders answered the door approximately three minutes later. Sanders told detectives that, on July 15, he picked up Naugle from Naugle's house on a "4-wheeler" after Naugle texted Sanders. (*Id*. at 76.) Sanders told detectives that Naugle later left Sanders' house "with Chris Schneck" who was riding in a "red blazer" with "some girl." (*Id*. at 74.) Sanders then told detectives that Naugle left with the girl and "[t]hey said they was [sic] going to New Albany to see Chris Schneck." (*Id*.) Sanders said Naugle left around 4:00 a.m. on July 16.

---

[2] Perry testified that "5-0" meant "[t]he police." (Tr. Vol. II at 155.)

[5] Detective Mitchell told Sanders that he had applied for a search warrant for Sanders' property, Sanders' phone, and Naugle's phone. The detectives told Sanders he could not go into the house because of the investigation, so Sanders asked detectives if he could "go work in the garden[.]" (*Id*. at 111.) Detectives indicated he "wasn't being detained, he could do so." (*Id*.) Instead of going to his garden, Sanders left the property.

[6] Once the search warrant and multiple members of local law enforcement arrived, detectives searched Sanders' property. During the search of the property, Pekin Town Marshal Jeff Topping located "fresh dig marks" in an area "south . . . of the home, back in the woods." (*Id*. at 115.) From there, Indiana State Trooper Kennan Ward observed "a small piece of rope coming out of the ground." (*Id*.) Officers "manipulated it with a stick and found that it actually was going into the ground." (*Id*.) They followed the rope and "found some leaves piled up and . . . found . . . [a] raised mount of ah, dirt, loose dirt." (*Id*.) Officers contacted their crime scene investigators to assist.

[7] Crime scene investigators slowly excavated the area and discovered the rope was "in a knot and it was tied in a manner around a larger object which was in turn a kind of black rubber matt [sic] or tarp that was in the ground." (*Id*. at 186.) After removing about fourteen inches of dirt, investigators located what was later identified as Naugle's body. At the time the body was found, "[f]rom the neck up there was no way to identify the body." (*Id*. at 117.)

[8] Crime Scene Investigator Phil D'Angelo testified there was "a large mass of maggots feasting on the biological material in the tarp[.]" (*Id.* at 188.) D'Angelo also testified, "there wasn't anything identifying as to the head besides the skull that was fragmented." (*Id.* at 189.) He also found a "plastic zip lock [sic] bag" with the word "hind" on it, (*id.*) and "a tin food can" with Naugle's body. (*Id.* at 188.) Investigators transported Naugle's body to the coroner's office for an autopsy.

[9] The pathologist who performed the autopsy, Dr. Thomas Sozio, had to "recreate portions of the skull." (*Id.* at 196.) Dr. Sozio's autopsy report indicated Naugle's cause of death was a "shotgun wound to the head" and listed the manner of death as "homicide." (*Id.* at 198.) In the tarp that had been around Naugle's body, Sergeant Mead located "20 gauge wadding."[3] (*Id.* at 213.) Testing revealed Sanders' DNA on the 20 gauge wadding. Further, based on the progression of the larva found on Naugle's body, entomologist Laura Weidner concluded that Naugle was killed between July 14 and 18, 2018.

[10] Officers returned to Sanders house to search for firearms. No one was present at Sanders' house. Officers located a disassembled 20-gauge shotgun beneath a hunting jacket on the pool table in the basement of the house and "a shotgun

---

[3] Wadding was described as a "filler wad" that "push[es] down the [gun] powder" when a shotgun is fired. (Tr. Vol. III at 38.) Additionally, wadding "keep[s] the pellets separate from the powder" in a shotgun shell. (*Id.* at 39.)

hull or shell that had been fired along with a wadding that was near a . . . burn pile or burn area in that backyard." (*Id.* at 199.) Near the burn pile, officers located a deer processing area, a black tarp resembling the tarp found around Naugle's body, and a possible "blood trail leading from where Mr. Naugle had been shot to where his body was drug to and buried." (*Id.* at 237.) Officers then called in a dive team to search the pond on Sanders' property. There, dive team members found Naugle's phone.

[11] On July 26, 2018, Officer Zach Elliot of the Austin Police Department received a report of a stolen vehicle. He located the vehicle and found Sanders was driving it. Officer Elliot arrested Sanders, whose "arms . . . [and] body was scratched up. . . . [H]e was covered in insect bites and like chigger bites all over most of his body." (*Id.* at 139.)

[12] On July 26, 2018, the State charged Sanders with murder. Sanders' jury trial began on October 28, 2019. The jury returned a verdict of guilty. On November 20, 2019, the trial court held a sentencing hearing and sentenced Sanders to sixty-three years.[4]

# Discussion and Decision

---

[4] The trial court also ordered Sanders to serve 652 days for violating probation in an earlier case, and the court ordered those days to be served consecutive to his sentence for murder. Sanders does not appeal that probation revocation order herein.

# 1. Sufficiency of the Evidence

[13] When reviewing sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the fact-finder's role, and not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to the fact-finder's determination. *Id.* We affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference reasonably may be drawn from it to support the decision. *Id.* at 147.

[14] To prove Sanders committed murder, the State had to present evidence he knowingly or intentionally killed Naugle. *See* Ind. Code § 35-42-1-1 (elements of murder). Sanders argues the State did not present sufficient evidence he killed Naugle because: (1) no one saw him kill Naugle; (2) the State did not present evidence that Sanders had a motive to kill Naugle; and (3) "there were no fingerprints or DNA on the shotgun that was the alleged murder weapon and other people had access to the property and access to the shotgun that was kept over the entryway door." (Br. of Appellant at 7.)

[15]     It is well-established that a murder conviction "may be sustained on circumstantial evidence alone." *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016). Here, there was substantial circumstantial evidence of Sanders' guilt. Possibly the most damning is the fact that Naugle's body was found buried on Sanders' property in a shallow grave and Sanders was the only person living at the residence. Additionally, Sanders was the last person to see Naugle and, despite exchanging 479 text messages and 81 calls with him over the two weeks leading up to Naugle's death, Sanders told Naugle's wife and investigators that he had not communicated with Naugle since July 16. Officers found Naugle's phone in a pond on Sanders' property, and Naugle's body was buried in a tarp identical to another tarp found on Sanders' property. Naugle died from a close-range shotgun wound to the head, and officers found a shotgun in Sanders' house that matched the type of gun used to kill Naugle. A piece of shotgun shell wadding with Sanders' DNA on it was found with Naugle's buried body. Finally, Sanders fled the scene when detectives told him they had obtained a search warrant, and flight is an indicator of guilt. *See Brink v. State*, 837 N.E.2d 192, 196 (Ind. Ct. App. 2005*) (*holding flight may be considered when determining guilt)*, trans. denied*. Sanders' arguments pointing to alleged deficiencies in the State's case are merely invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Drane*, 867 N.E.2d at 146 (appellate court cannot reweigh evidence or judge the

credibility of witnesses).  The State's evidence was sufficient to prove beyond a reasonable doubt that Sanders murdered Naugle. [5]

## 2. Admission of Evidence

We typically review allegations of error in the admission of evidence for an abuse of discretion, which occurs "when the trial court's ruling is clearly against the logic, facts, and circumstances presented." *Kindred v. State*, 973 N.E.2d 1245, 1252 (Ind. Ct. App. 2012).  As we conduct our review, we will not reweigh the evidence, and we must consider conflicting evidence in the light most favorable to the trial court's ruling.  *Id.*

During Sanders' trial, the State presented a redacted recording of the field interview Detectives Busick and Mitchell conducted on July 23, 2020, with Sanders at Sanders' house.  Sanders did not object at trial to the admission of this recording.  Thus, he must demonstrate fundamental error.  *See Taylor v. State*, 687 N.E.2d 606, 609 (Ind. Ct. App. 1997) (defendant who does not object at trial waives any claim of error on appeal unless the error is fundamental), *trans. denied*.  Fundamental error is a "blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Kindred*, 973 N.E.2d at 1252 (quoting

---

[5] As for Sanders' argument that the State failed to present evidence that Sanders had a motive to kill Naugle, we note the State had no such obligation.  *See Ivory v. State*, 141 N.E.3d 1273, 1280 (Ind. Ct. App. 2020) (motive is not an element of murder).

*Kimbrough v. State*, 911 N.E.2d 621, 634 (Ind. Ct. App. 2009)). The fundamental error exception is extremely narrow. *Id.*

### *A. Redacted Portions of the Audio Recording*

[18]   First, Sanders argues the trial court's admission of the redacted audio recording was an abuse of discretion that rose to the level of fundamental error because the redacted portions of the recording allowed the jury to make a forbidden inference that Sanders said something incriminating or something that would reflect poorly on his character. He also contends the "lengthy silence" created by some redactions prejudiced him because "[n]o juror is going to reasonably believe those redactions contain information that would tend to exonerate Mr. Sanders." (Br. of Appellant at 9.)

[19]   Indiana Rule of Evidence 106 states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." However, prior to the admission of the recording and its publication to the jury, the trial court confirmed that the redactions in the recording had been made "[b]y agreement of the parties." (Tr. Vol. II at 71.) Thus, Sanders invited the error of which he now complains by agreeing to the redactions of the recording prior to trial. "Invited errors are not subject to appellate review, and a party therefore may not invite error, and then subsequently argue that the error requires reversal." *Oldham v. State*, 779 N.E.2d 1162, 1171 (Ind. Ct. App. 2002), *trans. denied.* As Sanders assented to the redactions made in the recording, he cannot now

complain about what impression those redactions may have made. *See Gamble v. State*, 831 N.E.2d 178, 187 (Ind. Ct. App. 2005) ("[e]rror invited by the complaining party is not reversible error"), *trans. denied*.

### B. Statements Regarding Naugle's Drug Use

[20] Sanders next contends the recording's references to Naugle's drug use impermissibly would have led the jury to infer Sanders also used drugs, in violation of Indiana Evidence Rule 404(b). Pursuant to Evidence Rule 404(b), evidence of another crime, wrong or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" is inadmissible. Evid. Rule 404(b)(1). Sanders directs us to the following excerpts, during which the detectives discussed Naugle's drug use:

> [Detective Busick]: And you seen [sic] him here, I mean you run up the road and went and got him at 4 in the morning. You've seen him a lot recently – has he been okay? Do you think he's using drugs a little bit maybe?
>
> [Sanders]:     I don't know.
>
> [Detective Busick]:  You don't know?
>
> [Detective Mitchell]: What do you think though, from your gut? From knowing from [sic] all the years that you have?
>
> * * * * *
>
> [Detective Mitchell]:  So you think he was trying to get some dope from this Chris Schenk guy?

[Sanders]:    I don't know.

* * * * *

[Detective Mitchell]:  . . . here's here's [sic] what we think.  I, I [sic] don't think you did anything wrong.  I think he probably overdosed and we need to find him.  Because we [sic] got, we're doing, we're going to get everything on your phone, everything. Including text messages.  Verizon keeps text messages for eight to ten days and his as well.  We just want you to tell us where he's at bro [sic] so we can get him back to her.

[Sanders]:    I don't know where he is.

[Detective Mitchell]:  Nobody says you did anything wrong. Okay.

[Detective Busick]:  Okay, here's what my theory is, okay.  He hasn't been using for a while, okay.  He used something and he OD'd.  When you haven't been using for a while, you can't take as much.  He OD'd a lot easier than he would have a year ago, okay.  My scenario, what I think happened, he came back here and that happened and due to that everybody gets a little scared.

[Detective Mitchell]:  We see it every day.

(Tr. Vol. II at 81, 82, 90-91.)

[21]    While we agree these statements reference Naugle's alleged drug use, the detectives did not ask Sanders about his previous crimes or drug use. Consequently, Sanders has not demonstrated how the detectives' discussion of Naugle's drug use would lead the jury to infer Sanders also used drugs and thus

he has not demonstrated the fundamental error required to reverse based on an argument not raised at trial.

## C. Detectives' Comments

[22] Finally, Sanders asserts the recording includes the detectives' opinions, which are inadmissible under Indiana Evidence Rule 704(b). Specifically, Sanders takes issue with the following dialogue:

> [Detective Busick]: Don't you think it's odd that he's been gone for a week? I heard him and his wife had been doing well, kids have been good. They are nice.
>
> [Detective Mitchell]: You think that's odd, don't you?
>
> [Sanders]: Yeah.
>
> [Detective Busick]: I mean you had a lot of time to think about that. We haven't and I think it's odd so, I know there's something in your head and you're not going to get the man in trouble.

(*Id.* at 85.) Sanders contends these statements "convey the officer's [sic] opinions concerning [Sanders'] intent, guilt or innocence." (Br. of Appellant at 12.) However, he does not explain how these statements do so and thus he has

not demonstrated the fundamental error required to reverse on evidence not objected to during trial.[6]

[23] Any prejudice that could be inferred from the detective's opinion was slight because the statement was isolated and did not linger on that point. *See Hinesley v. State*, 999 N.E.2d 975, 986 (Ind. Ct. App. 2013) (if the evidence as a whole supports the conviction, an inconsequential reference to other evidence does not show prejudice), *reh'g denied*, *trans. denied*. Further, as we noted *supra*, the State presented sufficient evidence independent of the recording in question to prove Sanders was guilty – Sanders was the last person to see Naugle, Naugle was found buried in Sanders' backyard with items that were also found in Sanders' house, Sanders owned a shotgun that matched the weapon used to shoot Naugle, and Sanders' DNA was found on some of the shotgun shell wadding found with Naugle's body. Therefore, if there was an error in the admission of the challenged statements made in the recording, Sanders has not demonstrated the fundamental error necessary to reverse his conviction. *See McCorker v. State*, 797 N.E.2d 257, 267 (Ind. 2003) (substantial cumulative evidence independent of the evidence at issue renders the court's admission of such evidence harmless).

---

[6] In addition, Sanders contends the redacted recording contained a "vast amount of irrelevant information." (Br. of Appellant at 12.) However, Sanders does not cite to the statements he contends are irrelevant, and thus he has waived his argument for failure to make a cogent argument. *See* Indiana Appellate Rule 48(a)(8) (argument must contain issues presented supported by cogent argument, including citations to the record and relevant case law); *and see Hollowell v. State*, 707 N.E.2d 1014, 1025 (Ind. Ct. App. 1999) (failure to present a cogent argument waives the issue on appeal).

# 3. Prosecutorial Misconduct

In reviewing a claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Schmidt v. State*, 816 N.E.2d 925, 944 (Ind. Ct. App. 2004), *trans. denied*. The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct. *Id*. A claim of prosecutorial misconduct presented on appeal without a contemporaneous trial objection will not succeed unless the defendant establishes not only prosecutorial misconduct but also the additional grounds for fundamental error. *Ryan v. State*, 9 N.E.3d 663, 667-8 (Ind. 2014), *reh'g denied*. For prosecutorial misconduct to be fundamental error, it must make a fair trial impossible or amount to clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm. *Id*. at 668.

During closing argument, Sanders stated, "Um, there was no ah, fingerprint evidence ah, fingerprint evidence ah, that I saw or I don't think you'll see on this case." (Tr. Vol. III at 149.) Additionally, regarding the location of shotgun wadding in the bag with Naugle's body, Sanders commented:

> Um, the shotgun wadding was found among liquified remains in
> the body bag by the Indiana State Police, after the autopsy. If
> you recall this when ah, Sgt. D'Angelo ah, actually said I, I got a
> hunch, I want to go back. So he goes back to the autopsy room.
> Um, they try the metal detector and then he, he gets in, he and

ah, another Trooper Marty Meade actually put on rubber gloves and start going through the liquified material. My memory is that the head was gone at that point and that he had removed it by that time. I think that is different from the memory of testimony of um, my colleague [Prosecutor] and I, I leave it to you, to your own memory as to what ah, ah, as to what Phil D'Angelo actually testified to at that time. Regardless the wadding was found within this ah, and this very unpleasant but was found in this liquified material at the bottom of the bag, okay. And if you remember, if you recall, um Sgt. D'Angelo testifying about that bag, this was not like a case where a body was put, this was a pliable bag that was made of plastic or rubber I don't think he remembered exactly what it was, he knew, but it was something with liquid, it going to be moving around, okay. So the idea of that we have a wadding that popped out of a skull in this case is I, I, you're good, the Judge is the law and the facts, I would submit to you that I don't, I don't think that's there. Um, and I'll just leave it at that.

(*Id.* at 147-8.)

[26] During its rebuttal argument, the State commented, regarding the lack of fingerprint evidence on the alleged murder weapon:

> If the defendant's fingerprints were on the gun, the defense would have said, of course the defendant's fingerprints were on the gun, he's, that's the gun in his house. So, what do fingerprints on the gun tell us? Nothing. Nothing. [Defense counsel] would come up here and say, they are just making an assumption that the defendant used that gun for the murder because his fingerprints were on it, but of course his fingerprints were on it, because that gun was in his house.

(*Id*. at 155.) Additionally, the State argued during rebuttal, ". . . and [defense counsel] wants to say, well, he got very close to saying the police planted the wadding in the body bag. Come on, man. You saw these police officer's [sic] testify. It's very unfair, I think to accuse these police officers of planting evidence in the case. They are professionals." (*Id*. at 154.) Sanders objected and argued he "didn't accuse anyone of planting anything in that argument." (*Id*.) After trial court intervention, the State agreed to refrain from further commenting on the issue.[7] Sanders contends the State's comments about his counsel unfairly disparaged his counsel.

[27] The State continued with its argument, then stating:

> And so, look, the defense [sic] job is to poke holes in the State's case and [defense counsel] has done an admirable job with that. But the one thing that the defense doesn't have to do is put forward a theory, right? That's what I do and we've done that. But they have the luxury of not doing that. So, they can come up and poke holes in the case but they don't have to really explore the implications of what their version is.

---

[7] "Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection but must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then the defendant must request a mistrial." *Neville v. State*, 976 N.E.2d 1252, 1258 (Ind. Ct. App. 2012), *trans. denied*. Sanders did not do so, therefore, he must also demonstrate the State's comment constituted fundamental error. *See Booher v. State*, 773 N.E.2d 814, 817-8 (Ind. 2002) (where a claim of prosecutorial misconduct has been procedurally faulted for failing to properly raise the claim before the trial court, it is waived from appellate consideration for failure to preserve the error; the defendant must demonstrate fundamental error to overcome this waiver).

(*Id*. at 155.) Sanders did not object to this statement, and on appeal contends this statement "implicate[d] Michael Sanders [sic] constitutional right to prove the case, calling it a luxury[.]" (Br. of Appellant at 14.)

[28] Sanders also challenges the State's comment regarding his defense:

> The only element in this case, the only question in this case is did the defendant do it or not? The defense is he didn't do it. Implications from that are, somebody else did it. This is a defense. This defense is called SODIT, some other dude did it. It's a common defense. Some other dude did it, that's the implication. If he didn't do it, somebody did it. We know it's a murder. But he didn't do it so some other dude did it.

(Tr. Vol. III at 155-6.) Sanders did not object to the statement and on appeal contends the State's comment implied he was using "some sort of Defense attorney trope to convince the jury of his innocence." (Br. of Appellant at 14.)[8]

[29] Although Sanders did not properly preserve for our review any of the comments he challenges, he maintains the State's comments, taken as a whole, "improperly urged the jury to convict Michael Sanders for being a liar, a car

---

[8] Sanders also contends the State committed prosecutorial misconduct when, during closing argument, the State called him a liar "over fifteen times." (Br. of Appellant at 14.) However, our Indiana Supreme Court has held, "where evidence introduced at trial indicates that either the defendant was lying or that other witnesses were lying, comments by the prosecutor which merely 'pointed out the incongruities in the testimony presented at trial, concluded that someone must not be testifying truthfully, and invited the jury to determine which witness was telling the truth' did not constitute misconduct." *Cooper v. State*, 854 N.E.2d 831, 836 (Ind. 2006) (quoting *Hobson v. State*, 675 N.E.2d 1090, 1096 (Ind. 1999)). Here, the State was commenting on the inconsistencies between the statements Sanders gave to Naugle's wife, the police, and other investigators about Naugle leaving his property with a woman in a red jeep; statements which were ultimately found to be untrue after Naugle was found buried in Sanders' backyard. This was not prosecutorial misconduct.

thief, and a woodsman – for reasons other than his guilt, and because the State improperly commented on Sanders [sic] credibility a new trial should be held." (*Id.* at 18.) It is well-established that "[i]t is misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt." *Maldonado v. State*, 265 Ind. 492, 500, 355 N.E.2d 843, 849 (1976). However, when there is overwhelming independent evidence of a defendant's guilt, prosecutorial misconduct during closing argument may be harmless. *Coleman v. State*, 750 N.E.2d 370, 375 (Ind. 2001).

[30]　Such is the case here. The State presented evidence that Naugle's decomposing body was found in a shallow grave on Sanders' property, wrapped in a mat or a tarp similar to others found on Sanders' property. Sanders gave different accounts of Naugle's alleged whereabouts and, while he was in frequent contact with Naugle in the two weeks leading up to Naugle's disappearance, Sanders did not attempt to contact Naugle after Naugle disappeared. Additionally, a shotgun matching the type of shotgun used to kill Naugle was found in Sanders' house, where he lived alone. Finally, shotgun shell wadding with Sanders' DNA on it was found in the tarp with Naugle's body. That evidence, coupled with the fact that the jury was instructed that "[s]tatements made by the attorneys are not evidence[,]" (Tr. Vol. II at 46), leads us to conclude any prosecutorial misconduct that may have occurred based on the State's comments did not place Sanders in grave peril of an unfair trial. *See Norris v. State*, 113 N.E.3d 1245, 1252-3 (Ind. Ct. App. 2018) (in light of the instructions

to the jury and the overall strength of the State's case, no reversable prosecutorial misconduct), *reh'g denied*, *trans. denied*.

# 4. Inappropriate Sentence

Sanders argues his sentence is inappropriate in light of his character and the nature of his offense. Our standard of review on this issue is well settled:

> We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). In addition to the "due consideration" we are required to give to the trial court's sentencing decision, "we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007).

*Couch v. State*, 977 N.E.2d 1013, 1017 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*. The appellant bears the burden of demonstrating his sentence is inappropriate. *Amalfitano v. State*, 956 N.E.2d 208, 212 (Ind. Ct. App. 2011), *trans. denied*.

[32] When considering the nature of the offense, the advisory sentence is the starting point for determining the appropriateness of a sentence. *Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3(a). The trial court sentenced Sanders to sixty-three years for Naugle's murder.

[33] The nature of Sanders' offense was exceptionally egregious. Sanders shot Naugle, his long-time friend, "execution style in the back of the head." (Tr. Vol. II at 196.) He then buried Naugle on his property in a shallow grave and left him there for over a week until investigators discovered his body, which had been ravaged by insects and was unidentifiable from the neck up. He lied to Naugle's wife and police regarding Naugle's whereabouts and fled the property when told detectives had secured a search warrant. Additionally, he was found two days later driving a stolen car. Based thereon, we conclude the nature of Sanders' offense does not render his sentence inappropriate. *See Berkman v. State*, 976 N.E.2d 68, 79 (Ind. Ct. App. 2012) (sentence above the advisory not inappropriate based on egregious nature of crime), *trans. denied*, *cert. denied* 571 U.S. 863 (2013).

[34] When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). Sanders' criminal history shows an escalation of violence in his behavior, from a juvenile adjudication for theft to minor alcohol-related offenses, disorderly conduct, and felony sexual battery, for which he was on

probation at the time he killed Naugle. Sanders' criminal history is a poor reflection on his character as it reveals he "has not been deterred even after having been subjected to the police authority of the State." *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005).

[35] Sanders argues his sentence is inappropriate because he had "significant drug issues." (Br. of Appellant at 18.) However, he has not explained how his drug use justifies a reduction in sentence. *See Reis v. State*, 88 N.E.3d 1099, 1105-06 (Ind. Ct. App. 2017) (defendant failed to advance an argument regarding why his sentence is inappropriate in consideration of his alcohol problem). Therefore, based on his extensive and increasingly violent criminal history, we cannot conclude Sanders' sentence is inappropriate based on his character. *See Kayser v. State*, 131 N.E.3d 717, 724 (Ind. Ct. App. 2019) (Kayser's sentence above the advisory sentence not inappropriate based on Kayser's extensive criminal history).

# Conclusion

[36] We hold the State presented sufficient evidence to convict Sanders of Naugle's murder. Additionally, any error in the admission of the redacted audio recording of an interview with Sanders was harmless error based on overwhelming independent evidence of Sanders' guilt. Further, any prosecutorial misconduct during closing arguments did not put Sanders in grave peril of an unfair trial. Finally, Sanders' sentence is not inappropriate based on

the nature of his offense and his character.  Accordingly, we affirm the trial court's decisions.

[37]    Affirmed.

Robb, J., and Vaidik, J., concur.